UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                      Plaintiff,

      v.

ALBERTO ALFARO,

                      Defendant.
_____

REPORT & RECOMMENDATION

21-CR-6118EAW

## PRELIMINARY STATEMENT

By Order of Hon. Elizabeth A. Wolford, Chief United States District Judge, dated July 22, 2021, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 3).

On July 13, 2021, the grand jury returned a single-count indictment against Alberto Alfaro charging him with possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Docket # 1). Currently pending before this Court for report and recommendation is Alfaro's motion to suppress tangible evidence.[1]

---

[1] Alfaro filed several omnibus motions seeking other forms of relief, including *Brady* material, Rule 404(b), 608 and 609 materials, identification of informants, *Jencks* material, preservation of rough notes, a Rule 12(b)(4) notice, and leave to file additional motions. (Docket # 17). Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on November 18, 2021. (Docket ## 19, 20).

In his omnibus motions, Alfaro also sought to suppress statements. (Docket # 17 at ¶¶ 6-9). During the proceedings on November 18, 2021, the Court directed the government to provide Alfaro with notice of the specific statements it intends to offer at trial and directed Alfaro to respond to the government's letter with a supplemental affidavit in support of his request for suppression of those statements. (Docket ## 19, 20). By letter dated November 23, 2021, the government identified the statements it intends to introduce and, by letter dated December 8, 2021, counsel for Alfaro responded and requested leave to withdraw Alfaro's motion to suppress statements. (Docket ## 34, 35). Alfaro's request is granted.

(Docket ## 17, 33).  For the reasons discussed below, I recommend that the district court deny the motion to suppress tangible evidence.

## FACTUAL BACKGROUND

On January 27, 2022, and February 8 and 23, 2022, this Court held an evidentiary hearing on Alfaro's motion to suppress evidence (Docket ## 25, 26, 27, 28, 29),[2] after which the parties submitted post-hearing submissions (Docket ## 32, 33).  The government called two witnesses, United States Probation Officer Joseph Curran and United States Probation Intensive Supervision Specialist Xochitl Morales.  (Docket ## 28, 29).

I.   **Testimony of Curran**

At the time of his testimony, Curran had been employed by the United States Probation Office ("USPO") for approximately six-and-a-half years and before that had been employed as a probation officer for Monroe County.  (Tr. 4-5).  Curran described his duties as ensuring that his supervisees comply with the terms of court-imposed conditions and "help[ing] [them] be successful" by, for example, assisting with referrals to community resources.  (Tr. 4, 7).

Curran testified that in February 2019 Alfaro was serving a term of supervised release and was assigned to Curran for supervision.  (Tr. 6-7; Government's Exhibit ("G. Ex.") 1).  According to Curran, Alfaro was subject to court-ordered standard and special conditions of release, and Curran had responsibility for supervising Alfaro to ensure his compliance.  (Tr. 7-8; G. Ex. 1).  Alfaro's supervised release conditions required him to "submit to a search of his

---

[2] The transcript of the January 27, 2022 and February 8, 2022 hearing shall be referred to as "Tr. __." (Docket ## 28, 29).

2

person, property, vehicle, place of residence or any other property under his control, based upon reasonable suspicion, and permit confiscation of any evidence or contraband discovered." (Tr. 11-12; G. Ex. 1). The conditions also provided that Alfaro "shall not unlawfully possess a controlled substance" and "shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon." (G. Ex. 1). The court-ordered conditions of release were reflected on a form that Curran reviewed with Alfaro. (Tr. 8-9; G. Ex. 1). The following language was typewritten at the end of the form: "These conditions have been read to me. I fully understand the conditions and have been provided a copy of them." (G. Ex. 1). Curran testified that, after reviewing the conditions with Alfaro, both of them signed the form. (Tr. 8-9).

Curran testified that the USPO adhered to a written "Search and Seizure Policy" at the time of Alfaro's search, which permitted probation officers to search a supervisee's residence upon "reasonable suspicion that contraband or evidence of a violation of the conditions of supervision may be found." (Tr. 12-14; G. Ex. 2). The policy provided that "reasonable suspicion exists when the officer, based on particularized and articulate facts, reasonably believes that contraband or evidence of a violation of the conditions of supervision may be found at the place or in the item being searched." (G. Ex. 2 at 3). Prior to conducting a residence search, an officer was required to obtain approval from a supervisor or set coordinator. (Tr. 14-15; G. Ex. 2 at 4). The policy also stated, "This policy is not the source of rights for offenders." (G. Ex. 2 at 1).

In late September or early October 2020 Curran received a phone call from Malcolm Van Alstyne, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). (Tr. 21-22). Van Alstyne explained that he was contacting Curran due to officer safety concerns based upon information from a confidential informant that Alfaro "could be in

3

possession of firearms and drugs." (Tr. 21). Van Alstyne asked Curran to provide certain information about Alfaro, including his sentence and the crime for which he had been convicted. (Tr. 22). Curran provided the information to Van Alstyne by text message. (*Id.*).

After receiving the text, Van Alstyne called Curran and told him that he had photographs and a video "from the CI at Mr. Alfaro's residence" and requested to meet with Curran to show him the material. (Tr. 23). Sometime between October 5, 2020 and November 5, 2020, Curran met with Van Alstyne and viewed the photographs; he could not recall whether he also viewed the video. (Tr. 23-24). According to Curran, some of the photographs depicted the bathroom in Alfaro's residence; Curran recognized the bathroom as Alfaro's from his supervision visits to Alfaro's residence. (Tr. 24-26, 29-30, 45-46; G. Ex. 3). The photographs also depicted a handgun, a rifle, and a prescription pill bottle with Alfaro's name on it. (Tr. 23-24; G. Ex. 3). Two of them depicted a hand that appeared to be pulling back a removable panel from the bathroom wall next to the shower. (Tr. 57; G. Ex. 3). Based upon Van Alstyne's statements, Curran understood that the confidential informant had provided the photographs to Van Alstyne. (Tr. 29-30). Curran himself did not know the identity of the confidential informant or whether the informant had previously provided valuable information to ATF, and he did not ask Van Alstyne any questions about the informant or the informant's relationship with law enforcement. (Tr. 31-32, 49-51, 59-60).

Based upon this information and review of the photographs, Curran believed that reasonable suspicion existed to search Alfaro's residence to "verify if he was in compliance with his conditions [and to determine whether] he had contraband that he was not supposed to have." (Tr. 32, 51-52). Curran spoke with the USPO set coordinator and conveyed the information that Van Alstyne had provided. (Tr. 33). The set coordinator instructed Curran "to get clarifying

4

information on how old or when this information was provided to Special Agent Van Alstyne." (*Id.*).

On November 5, 2020, Curran texted Van Alstyne and asked him, "How long ago was that video you showed me from?" (Tr. 29; G. Ex. 3). Van Alstyne responded that he believed it was "within a week of me showing it to you." (*Id.*). Curran interpreted Van Alstyne's message to mean that Van Alstyne had received the video from the confidential informant approximately one week before showing it to Curran. (Tr. 31). Curran acknowledged that, apart from this exchange, he did not have any information about when the video or photographs had been taken and conceded that it was theoretically possible that the photographs had been taken before Alfaro had been released from incarceration. (Tr. 31, 53). Curran asked Van Alstyne to send him the photographs or the video, and Van Alstyne sent him several of the photographs. (G. Ex. 3).

Curran then drafted a search plan for Alfaro's residence at 852 North Street and submitted it for approval on November 9, 2020. (Tr. 18-20, 32-33; G. Ex. 4). In the section describing the basis for believing that reasonable suspicion existed to support the search, Curran wrote: "[o]btained information from ATF agents that a confidential source observed firearms and drugs inside [Alfaro's] residence." (Tr. 21, 58; G. Ex. 4). Curran testified that, although the search plan did not include any reference to the photographs, his supervisor knew about the photographs prior to approving the search of Alfaro's residence. (Tr. 18, 59-60; G. Ex. 4).

The search of Alfaro's residence occurred on November 13, 2020. (Tr. 33). Curran was part of the search team but did not participate in the actual search of the residence. (Tr. 34). Instead, Curran searched Alfaro and remained with him while the search was being conducted. (Tr. 34, 37). Curran learned that officers discovered a loaded firearm and

ammunition during the search. (Tr. 37-39; G. Ex. 5). Curran testified that the firearm recovered from Alfaro's residence did not appear to be the same handgun shown in the photographs. (Tr. 55).

## II. Testimony of Morales

At the time of her testimony, Morales had been employed by the USPO as an Intensive Supervision Specialist for approximately six years and had previously been employed as a county probation officer. (Tr. 75-77). On November 13, 2020, Morales was part of the search team assigned to conduct the search of Alfaro's residence at 852 North Street. (Tr. 77-78). Morales did not know Alfaro, was not responsible for his supervision, and had not previously been to his residence. (Tr. 79-80). According to Morales, she had been advised that the team was looking for drugs and firearms and had reviewed the search plan. (Tr. 81, 99). Morales had not reviewed the photographs or video that Van Alstyne had provided to Curran, and she had no prior knowledge that contraband might be secreted inside a panel in the bathroom of Alfaro's residence. (Tr. 99-100).

During the early morning hours of November 13, 2020, Morales entered Alfaro's residence with the search team and helped clear the residence to promote officer safety. (Tr. 81, 101). Once the residence was cleared, Morales was assigned to search the bathroom. (Tr. 82, 101-102). Morales noticed a panel that was screwed into the wall of the bathroom that looked like it had been opened previously. (Tr. 82-83, 93). Morales called for assistance in order to open the panel and search behind it. (Tr. 83-85, 93). After opening the panel, Morales discovered an empty rifle case and two bags. (Tr. 85-90, 107-109; G. Exs. 9 and 10). One of the

bags contained a handgun, and the other bag contained a scale, baggies, and a substance. (Tr. 90-93; G. Exs. 9 and 10).

Morales also searched the kitchen and discovered a rifle scope in one of the kitchen cabinets. (Tr. 94-95; G. Ex. 11). She also found ammunition behind a wall panel just outside the bathroom. (Tr. 96-98; G. Ex. 12). Morales testified that, based upon her discovery of contraband behind the panel inside the bathroom, she believed that the panel outside the bathroom might also contain contraband. (Tr. 98).

## REPORT & RECOMMENDATION

Alfaro seeks to suppress all evidence seized during the warrantless search of his residence on November 13, 2020. (Docket ## 17, 33). According to Alfaro, the warrantless search was not justified by reasonable suspicion because the information known to Curran prior to the search was stale and had been provided by an informant whose reliability had not been assessed by Curran. (Docket # 33). The government counters that Curran did not need reasonable suspicion to search Alfaro's residence so long as the search was reasonably related to Curran's supervisory duties. (Docket # 32 at 12-16). In the government's estimation, reasonable suspicion existed to justify the search, in any event. (*Id.* at 7-11).

The Fourth Amendment generally prohibits law enforcement officers from conducting a warrantless search or seizure of a defendant's residence or property, *see* U.S. Const. amend. IV; *United States v. Place*, 462 U.S. 696, 701 (1983) ("seizure of personal property [is] per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant"), and "[i]t is beyond dispute that a parolee's home, 'like anyone else's, is protected by the Fourth Amendment's requirement that searches be reasonable,'" *see*

*United States v. Braggs*, 5 F.4th 183, 186 (2d Cir. 2021) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).  "[W]hether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)).  To determine whether a defendant possessed a reasonable expectation of privacy, the court must first consider whether the defendant exhibited an actual expectation of privacy and, second, whether that expectation is one that society is prepared to recognize as reasonable.  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan J., concurring); *see California v. Ciraolo*, 476 U.S. 207, 213 (1986) (analyzing reasonableness of expectation of privacy under *Katz* two-prong test).

"By virtue of their status alone," individuals on parole, probation, or supervised release "have severely diminished expectations of privacy."  *See United States v. Barner*, 666 F.3d 79, 84 (2d Cir. 2012); *Samson v. California*, 547 U.S. at 849 ("parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment"); *see also United States v. Knights*, 534 U.S. at 119-20 (probationer's reasonable expectation of privacy is less than that of an ordinary citizen); *United States v. Elder*, 805 F. App'x 19, 21 (2d Cir. 2020) (summary order) ("[p]ersons on supervised release have a diminished expectation of privacy"), *cert. denied*, 141 S. Ct. 1055 (2021); *United States v. Reyes*, 283 F.3d 446, 458 (2d Cir.) (holding that individuals on federal supervised release have diminished Fourth Amendment protections), *cert. denied*, 537 U.S. 822 (2002); *United States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) ("[a] parolee's reasonable expectations of privacy are less than those of ordinary citizens and are even less so where, as

here, the parolee, as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer") (citations omitted), *cert. denied*, 549 U.S. 1136 (2007); *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) ("parole justifies some departure from traditional Fourth Amendment standards"). Individuals on parole have even more diminished expectations of privacy than those on probation. *See United States v. Braggs*, 5 4th at 187 n.3 ("parolees have fewer expectations of privacy than probationers") (internal quotations omitted). Comparatively speaking, "[s]upervised release, parole, and probation lie on a continuum," *United States v. Lifshitz*, 369 F.3d 173, 181 n.4 (2d Cir. 2004), and "[t]he most severe is 'supervised release,' which is 'meted out in addition to, not in lieu of, incarceration[;] . . . followed, in descending order, by parole, then probation," *id.* (quoting *United States v. Reyes*, 283 F.3d at 461). An individual's "expectation of privacy is further diminished where he has consented to a search condition." *United States v. Jackson*, 663 F. App'x 31, 33 (2d Cir. 2016) (summary order).

Parole and supervised release are similar insofar as both are terms of supervision following incarceration. *Reyes*, 283 F.3d at 458. Supervised release, however, "differs from parole in an important respect: unlike parole, supervised release does not replace a part of a term of incarceration, but instead is . . . given *in addition* to any term of imprisonment imposed by a court." *Id.* (internal quotations omitted). "[S]upervised release . . . is imposed by a federal district court as *part of a total sentence in addition to* a period of incarceration at the time of the initial sentencing of a convicted federal criminal defendant." *Id.* at 456 (internal quotations omitted) ("supervised release is an integral part of the original sentence imposed pursuant to court order and executed by the federal probation officer").

"The Supreme Court has acknowledged the need for exceptions to the warrant and probable cause requirements of the Fourth Amendment where an administrative agency has 'special needs, beyond the normal need for law enforcement.'" *Id.* at 461 (quoting *Griffin v. Wisconsin*, 483 U.S. at 873 ("[a] state's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements"). Pursuant to the "special needs doctrine," courts have recognized the government's "overwhelming" interest in closely monitoring individuals on probation, parole and supervised release. *Samson*, 547 U.S. at 853 ("[t]his Court has repeatedly acknowledged that a State has an overwhelming interest in supervising parolees because parolees are more likely to commit future criminal offenses[;] [s]imilarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment") (internal quotation and citations omitted); *United States v. Newton*, 369 F.3d 659, 665 (2d Cir.) ("[r]elying on the 'special needs' exception . . . , this court has ruled that operation of a parole system also presents special needs justifying a departure from the traditional Fourth Amendment warrant requirement") (emphasis omitted), *cert. denied*, 543 U.S. 947 (2004); *Reyes*, 283 F.3d at 462 ("[t]he overwhelming interest in ensuring that a parolee complies with parole requirements . . . also exists in full measure with respect to a convicted person serving a term of federal supervised release") (internal quotations and brackets omitted).

Probation officers charged with supervising individuals on supervised release "owe a responsibility to the public to ensure that the offender who poses a threat to public safety is not permitted to remain free, absent compliance with conditions which obviate possible

10

danger." *Reyes*, 283 F.3d at 457 (internal quotations and brackets omitted). Accordingly, probation officers are "given considerable investigative leeway, . . . [because,] in bringing a supervisee's offending conduct to the attention of the court, they act as the eyes and ears of the court." *United States v. Elder*, 805 F. App'x at 22 (internal citation and quotations omitted). Considering the weighty interests in ensuring compliance with release conditions, courts have concluded that searches that may be unreasonable as to ordinary citizens may be reasonable as to supervised releasees. *See id.* at 21 (summary order) ("[o]ne exception to [the warrant requirement] is when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable[;] . . . [s]upervision is one such special need") (internal quotations and citation omitted); *United States v. Townsend*, 371 F. App'x 122, 124 (2d Cir.) (summary order) ("the federal system of supervised release presents special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements") (internal quotations omitted), *cert. denied*, 562 U.S. 1037 (2010); *see also United States v. Barner*, 666 F.3d at 84 ("[i]n the context of parole and probation, the Supreme Court has explained that . . . 'special needs beyond normal law enforcement . . . may justify departures from the usual warrant and probable-cause requirements'[;] [a]s a result, 'probationers may be subject to a degree of impingement upon privacy that would not be constitutional if applied to the public at large'") (quoting *Griffin*, 483 U.S. at 873, *and United States v. Grimes*, 225 F.3d at 258)); *Reyes*, 283 F.3d at 462 ("the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release").

The parties do not dispute that the probable cause requirement of the Fourth Amendment does not apply to the search of Alfaro's residence. Although they agree that a lesser standard is applicable, they disagree about which standard applies. Alfaro maintains that the applicable inquiry is reasonable suspicion, while the government contends that the applicable inquiry is the special needs standard. The government's position finds ample support in the Second Circuit's decision in *United States v. Braggs*, holding that a search of a parolee's residence is constitutionally permissible so long as it is "reasonably related to the performance of the [parole] officers' duties" and does not need to be supported by reasonable suspicion. 5 F.4th at 188.

In *Braggs*, the Second Circuit reversed the district court's determination that reasonable suspicion was constitutionally required to search a parolee's residence and upheld the search under a "straightforward application of the Special Needs Doctrine." *Id.* at 186, 188. The district court had held that although the defendant had consented to parole searches as a condition of his release, the directives governing the parole officer's duties required "articulable reason" prior to conducting a search, which the court had determined was equivalent to reasonable suspicion. *Id.* The district court further found that an anonymous tip that the defendant "may have guns in his house" was insufficient to establish reasonable suspicion. *Id.* at 185-86. On appeal, the Second Circuit held that appropriate inquiry is whether the "search undertaken by a parole officer of a parolee to detect parole violations is reasonably related to the parole officer's duties," reasoning that "such a search is permissible under the Special Needs framework and accordingly comports with the Fourth Amendment." *Id.* at 188 (internal quotations omitted).

In reaching this conclusion, the Court in *Braggs* acknowledged that applicable caselaw addressing searches of persons under supervision was "muddled" and sometimes "overlooked" the distinction between investigative searches – those conducted by law enforcement for the purpose of detecting criminal conduct – and supervision searches – those conducted by supervising officers to ensure compliance with release conditions. *Id.* at 186, 187-88 & n.4 ("[in *Knights* and *Samson* the defendants] were searched by municipal police officers charged with vindicating the [s]tate's general interest in law enforcement, . . . rather than by parole officers responsible for furthering the special needs of the parole system") (internal quotations and alterations omitted) (citing *Samson*, 547 U.S. at 847 and *Knights*, 534 U.S. 112). The Court clarified that the standard applicable to investigative searches is grounded in diminished expectations of privacy, while the standard applicable to supervision searches is grounded in the special needs doctrine. *Id.* at 188 (citing *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007)). Although *Braggs* addressed the search of a parolee's residence, the reasoning of *Braggs* in applying the special needs exception is equally applicable to a search of a residence of an individual on supervised release.[3] *See United States v. Watkins*, 2022 WL 1037443, *3 (W.D.N.Y. 2022) (rejecting defendant's argument that probation officer needed reasonable suspicion to justify a warrantless search of defendant's residence; "[because] the USPOs' visit to and search of the defendant's residence . . . were undertaken as part of their

---

[3] In *Braggs*, the defendant's parole conditions included a condition permitting his parole officer to search his person, residence, and property without reference to reasonable suspicion, *Braggs*, 5 F.4th at 185, while Alfaro's supervised release conditions included a condition permitting probation officers to search his person, property, vehicle and residence "based upon reasonable suspicion." (G. Ex. 1). This distinction does not compel a different outcome here since the justification for the search is grounded in the special needs doctrine. While the particular search condition imposed upon Alfaro may be relevant to evaluate the reasonableness of an investigative search directed by law enforcement, I do not find that the condition would render unconstitutional a search otherwise constitutionally permissible under the Fourth Amendment pursuant to the special needs doctrine. *Cf. United States v. Newton*, 369 F.3d at 668 ("[the special needs doctrine] does not require a parolee's consent to permit parole officers to conduct a warrantless search reasonably related to their supervision responsibilities") (citing *Grimes*, 225 F.3d at 259 n.4).

13

duties of supervision over the defendant who was on supervised release, their actions were constitutionally permissible").

In this case, Curran testified that he made the determination to request supervisory authorization to conduct the search of Alfaro's residence after receiving information from ATF Agent Van Alstyne that a confidential informant had reported that Alfaro might have guns and drugs – both of which were prohibited by Alfaro's release conditions – inside his residence. The record suggests that Agent Van Alstyne credited this information and conveyed it to Curran out of a concern for Curran's safety as Alfaro's probation officer. Curran also testified that he observed photographs of a handgun, rifle and prescription pill bottle with Alfaro's name that Van Alstyne had received from the informant. Curran understood that Van Alstyne had received the photographs within one week of showing them to Curran. Based upon his own familiarity with Alfaro's residence, Curran knew that some of the photographs depicted Alfaro's bathroom, including a removable wall panel, and show that the individual who took the photographs took the bathroom photographs while inside Alfaro's residence. Curran's testimony, which I find credible, further established that the purpose of the search was to determine whether Alfaro was violating the conditions of his release.

Under the *Braggs* standard, Alfaro's challenges – that the informant's information was impermissibly stale because Curran did not know when the photographs were taken and knew nothing about the informant's identity and credibility – are unavailing. As an initial matter, the information was provided by an ATF Agent who was concerned for Curran's safety based upon information from a confidential source that there might be firearms within the residence. *See United States v. Townsend*, 371 F. App'x at 124 ("where 'special needs' such as those presented by the supervised release system exist, it is 'reasonable to permit information

14

provided by a police officer, whether or not on the basis of firsthand knowledge, to support a search") (internal quotations, ellipses, and emphasis omitted); *see also Griffin*, 483 U.S. at 79 ("it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts").

Indeed, in *Braggs* itself, the parole search upheld under the special needs justification was prompted by a tip conveyed by law enforcement from an *anonymous* source that the defendant "may" have firearms in his residence. *See Braggs*, 5 F.4th at 185, 188; *see also United States v. Watkins*, 2022 WL 1037443 at *3 (upholding search of residence of defendant who was on supervised release based upon "an anonymous tip advising that the defendant possessed two guns"); *United States v. Frazier*, 2020 WL 6488420, *1-2 (E.D.N.Y. 2020) (upholding search based upon "reliable tip [received by police department and communicated to parole department] that the [d]efendant had a firearm in his apartment"); *cf. Griffin*, 483 U.S. at 880 ("unauthenticated tip of a police officer[ ] bearing, as far as the record shows, no indication whether its basis was firsthand knowledge or, if not, whether the firsthand source was reliable, and merely stating that [defendant] 'had or might have' guns in his residence, not that he certainly had them" justified search of probationer's residence). In this case, the information was provided by a confidential informant known to ATF, although not known to Curran, which renders the information inherently more reliable than had it been provided by an anonymous source. *See United States v. Roman*, 2021 WL 327729, *5 (D. Conn. 2021) ("[i]nformants known to the [g]overnment are more reliable than anonymous tipsters") (citing *Caldarola v. Calabrese*, 298 F.3d 156, 165 (2d Cir. 2002)); *see also Griffin*, 483 U.S. at 880 ("we think it reasonable to permit information provided by a police officer, whether or not on the basis of

firsthand knowledge, to support a probationer search[;] . . . police may be unwilling to disclose their confidential sources to probation personnel[;] . . . we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search"). Further, the information was corroborated at least in part by photographs provided by the informant showing firearms and a prescription pill bottle and the inside of Alfaro's bathroom with a removable wall panel. *United States v. Devaughn*, 2022 WL 101910, *1, 5 (S.D.N.Y. 2022) (confidential informant's information that defendant was engaged in narcotics activity and firearms possession "was corroborated by the video evidence [depicting packaging of narcotics and prepackaged narcotics] the [confidential informant] forwarded to the [police department]" and the confidential informant's statement "that the videos were recorded in [d]efendant's bedroom at his residence"). Moreover, the testimony suggests that Van Alstyne provided the photographs to Curran either within one week of receiving them from the confidential source (as Curran interpreted Van Alstyne's text response) or within one week of the informant taking them (as the text may also be interpreted), leading to the search within approximately one month of Curran's meeting with Van Alstyne. *See id.* at *5 (rejecting argument that the "parole officers improperly conducted the search in January 2021 based on 'stale' information that the [confidential informant and police department] provided in October 2020"); *United States v. Bazemore*, 2021 WL 1719233, *4 (S.D.N.Y. 2021) ("[i]n the instant case, only five weeks elapsed between the [incident] and the [parole] search").

The record in this case demonstrates that Curran received information from ATF suggesting that Alfaro was violating his release conditions by keeping firearms and narcotics in his residence. The information came from an informant known to ATF and was corroborated by photographs depicting the inside of Alfaro's residence and firearms and a pill bottle. Once this

16

information was brought to Curran's attention, Curran appropriately took steps to investigate whether Alfaro was violating his release conditions. *Reyes*, 283 F.3d at 459 ("[w]e have long recognized a duty on the part of the parole officer to investigate whether a parolee is violating his conditions of parole . . . when the possibility of violation is brought to the officer's attention"). Under these circumstances, I find that the search of Alfaro's residence was reasonably related to Curran's duties, was "permissible under the Special Needs framework[,] and accordingly comports with the Fourth Amendment." *See Braggs*, 5 4th at 188 (internal quotations and brackets omitted); *Barner*, 666 F.3d at 85 (search was reasonably related to parole officer's duties where it "was performed in direct response to information that [the officer] obtained and that she had a duty to investigate further"); *Newton*, 369 F.3d at 666 ("once the parole officers in this case received information that [defendant] had a gun at his residence and had threatened his mother and her husband, it was a reasonable exercise of their parole duty to search [the apartment]"); *Watkins*, 2022 WL 1037443 at *3 ("[o]nce the USPO received notice of an anonymous tip advising that the defendant possessed two guns, a clear violation of his supervised release conditions, they were obligated to carry out the duties of supervision of the defendant by investigating the matter to determine whether the defendant was complying with his conditions of supervised release"); *United States v. Devaughn*, 2022 WL 101910 at *5 ("the parole officers conducted the parole search based on the information the [confidential informant] provided the [police department]; . . . the parole officers' search was reasonable under the Fourth Amendment to recover any evidence showing that [d]efendant was violating the express conditions of his parole"); *United States v. Turner*, 2021 WL 8055692, *4 (S.D.N.Y. 2021) ("[f]ar from arbitrary, capricious, or harassing, here the decision to search defendant's apartment was made by [the parole officer and his supervisors] after viewing a video showing their parolee

brandishing a gun[;] . . . after viewing the video of its parolee with a gun in his hand, [p]arole would have been derelict in its duty if it failed to search defendant's apartment"); *United States v. Frazier*, 2020 WL 6488420 at *2 ("[t]he instant search was conducted pursuant to a tip received by law enforcement that the parolee had a firearm in his apartment[;] [t]he Second Circuit has treated parole searches effectuated pursuant to such a tip as presumptively rationally and reasonably related to the parole officer's job duties, absent affirmative indications of unreliability, and there are no such indications present here").

Although I conclude that I need not assess whether the search was supported by reasonable suspicion, even if that standard applied, I find that the facts known to Curran present at least a sufficiently close call that, when coupled with Curran's good faith conduct, which included consulting with his supervisor and meeting with and obtaining additional information from Van Alstyne, exclusion would not be justified in any event. Put another way, even assuming Curran could have done more to investigate or corroborate the information provided by Van Alstyne prior to searching Alfaro's residence, "this is not the kind of flagrant or abusive police misconduct that warrants application of the exclusionary rule." *Elder*, 805 F. App'x at 23 (upholding denial of suppression motion where USPO officer conducted search of defendant's residence based upon report of four tips provided to the Drug Enforcement Administration over the course of two months that defendant, "who was under federal supervision, was engaging in the illegal distribution of drugs").

## **CONCLUSION**

For for the reasons stated above, I recommend that the district court deny Alfaro's motion to suppress tangible evidence.  **(Docket ## 17, 33)**.  As noted above, *see supra* note 1, Alfaro's motion to suppress statements has been withdrawn.

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
         June 21, 2022

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*  
MARIAN W. PAYSON  
United States Magistrate Judge

Dated:  Rochester, New York
       June 21, 2022

---

[4] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).